AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br><br>Jesus Jesse Ryan Isaguirre<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br>6:26-mj 1861 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 23, 2026_____ in the county of _____Brevard_____ in the
_____Middle_____ District of _____Florida_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) | Distribution of 500 grams or more of a mixture and substance containing a detectable amount of cocaine |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Rebecca Spears, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me
pursuant to Fed. R. Crim. P. 4.1 and 41(d).

Date:     7/22/2026
_____

City and state:          Orlando, FL          _____

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

**STATE OF FLORIDA**                    **Case No: 6:26-mj-** 1861

**COUNTY OF ORANGE**

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Rebecca Spears, being duly sworn, hereby depose and state as follows:

### BACKGROUND

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been since June 2021. I am currently assigned to the Tampa Division - Brevard Resident Agency, where I am responsible for conducting criminal investigations. As a graduate of the FBI Academy in Quantico, Virginia, and through prior law enforcement experience, I have received training in areas of violent crimes, bank robberies, Hobbs Act robberies, homicides, crimes on the high seas, sexual abuse cases, and drug trafficking investigations. I have conducted and assisted in numerous investigations involving arrests and search warrants that resulted in successful prosecutions of persons engaged in violations of state and federal law.

2.      During my tenure with the FBI, I have been trained in the methods that drug traffickers use to distribute controlled substances, and I am familiar with how drug traffickers manage, transport, and conceal the proceeds of their drug trafficking activities. I have participated in narcotics investigations, and I am familiar with various methods of investigation, including controlled purchases of narcotics, visual surveillance, interviewing witnesses, executing arrest and search warrants, the use of confidential informants and sources, the use of pen registers and trap and trace devices, the installation and use of global positioning system (GPS) mobile tracking

devices, the use of electronic recording/listening devices, and the use of court-authorized prospective cellphone geo-location information in the investigation of narcotics offenses.

3. During my tenure with the FBI, I have been the case agent of numerous investigations and the affiant of search warrants that resulted in the seizure of controlled substances and other drug trafficking evidence. These investigations resulted in the arrest of individuals who have smuggled, received, and distributed controlled substances, including cocaine, heroin, fentanyl, and methamphetamine.

4. I have also conducted investigations concerning the identification of coconspirators using telephone records, financial records, drug ledgers, and other pertinent documents. I have participated in the debriefings of many of those individuals who were arrested and cooperated with the government regarding various violations of Title 21 and Title 18 of the United States Code.

5. I have directed numerous confidential informants to successfully infiltrate various narcotics organizations by way of intelligence gathering, participation in consensual recordings, and purchases of controlled substances. I have executed search warrants for controlled substances and other drug-related evidence and conducted surveillance in connection with numerous narcotics investigations.

## PURPOSE OF AFFIDAVIT

6. This affidavit is being submitted to establish probable cause in support of a criminal complaint against Jesus Jesse Ryan ISAGUIRRE for the distribution of

500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), in the Middle District of Florida on or about March 23, 2026.

7.      The facts set forth in this affidavit come from my personal observations, training and experience, and information obtained from other agents, witnesses, third-party records, and databases. This affidavit is intended to show merely that there is sufficient probable cause for a criminal complaint and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

8.      In August 2025, an FBI Confidential Human Source (CHS) provided information to the FBI about ISAGUIRRE's drug trafficking activities. The CHS identified ISAGUIRRE as a counterfeit pill and cocaine distributor operating in Brevard County and Palm Beach County, Florida. The CHS stated that ISAGUIRRE resides in West Palm Beach, Florida but did not know the exact address of the residence. The CHS stated he/she could purchase kilograms of cocaine and thousands of counterfeit pills from ISAGUIRRE.

9.      ISAGUIRRE is a multi-time convicted felon. The CHS is not a convicted felon and is providing assistance in hopes of receiving leniency related to a potential drug charge. The information from the CHS has been corroborated and found to be credible through surveillance, two successful controlled purchase operations, and law enforcement database searches concerning known associates of ISAGUIRRE.

3

10. The CHS conducted two controlled purchases from ISAGUIRRE. The two controlled purchases—one for counterfeit pills in the Southern District of Florida and one for a kilogram of cocaine in the Middle District of Florida—are discussed in detail below. Additionally, the CHS arranged to purchase an additional kilogram of cocaine from ISAGUIRRE in the Middle District of Florida on July 21, 2026. Details of this additional operation and surveillance throughout the investigation are also discussed below.

11. For each of the controlled purchases, agents searched the CHS before and after the deal and found no contraband or unauthorized items. Agents provided the CHS with investigative funds used to purchase the drugs. Agents also equipped the CHS with audio/video recorders so that a recording of the transactions could be obtained as evidence. After each deal, agents collected the drugs from the CHS, conducted a field test, and then sent them to the Drug Enforcement Administration (DEA) laboratory for analysis.

### November 11, 2025 – Deal for Counterfeit Adderall Pills

12. On Tuesday, November 11, 2025, members of the FBI, DEA, and local law enforcement utilized the CHS and arranged a controlled purchase of 300 counterfeit Adderall pills from ISAGUIRRE for $900. According to the CHS, the pills ISAGUIRRE sold contained methamphetamine.

13. Before the deal, on November 7, 2025, the CHS initiated conversation via text message with ISAGUIRRE, who was utilizing phone number (XXX) XXX-6178. During this conversation, the CHS and ISAGUIRRE discussed how narcotics

are getting difficult to find. ISAGUIRRE informed the CHS that he has sources of supply in Miami, Orlando, and Palm Beach who can sell "Blocks," which the CHS informed agents is the term used to reference kilogram amounts of cocaine. The CHS informed ISAGUIRRE that he/she would be in the West Palm Beach area on Tuesday, November 11, 2025, but he/she was only looking for Adderall pills. ISAGUIRRE, who was familiar with the CHS being from Brevard County, told the CHS that he would sell the pills to the CHS once he/she arrived in West Palm Beach. Later in the conversation, ISAGUIRRE agreed to sell the CHS 300 Adderall pills in exchange for $900. The conversation between the CHS and ISAGUIRRE about narcotics continued via text message throughout the weekend. In sum, their communications about narcotics included discussing the color and quantities of the pills that ISAGUIRRE would sell as well as additional information about the "Blocks" and blue pills. ISAGUIRRE referred to these blue pills as "blueberries," which, based on my investigative experience and information learned during this investigation, is believed to be a term for blue-colored pills that contain fentanyl.

14.     On November 11, 2025, the CHS texted ISAGUIRRE to confirm that the deal was still going to happen. ISAGUIRRE responded in confirmation. Accordingly, FBI and DEA personnel met with the CHS at a predetermined location in West Palm Beach. At approximately 6:27 p.m., the CHS conducted a recorded controlled phone call with ISAGUIRRE. During this conversation, the CHS informed ISAGUIRRE that he/she was at a location on Forest Hill Blvd.

5

ISAGUIRRE instructed the CHS to stay at the location because ISAGUIRRE was almost home and lived near that location.

15.     FBI Task Force Officer (TFO) Cameron Peppiatt, witnessed by me, searched the CHS's person and the CHS's vehicle and did not locate any contraband. FBI TFO Peppiatt, witnessed by me, equipped the CHS with audio/video recording devices and provided the CHS with $900 of documented funds. The CHS was deployed to the parking lot of the business located on Forest Hill Blvd., where the CHS arrived at approximately 6:56 p.m. In anticipation of ISAGUIRRE living at his listed address according to the Florida Driver and Vehicle Information Database (DAVID), agents and TFOs established surveillance in the area of the XXXX Red Pine Lane, Apartment D, Greenacres, Florida 33415.

16.     At approximately 7:18 p.m., ISAGUIRRE sent the CHS a text message informing the CHS to meet at XXX Foxtail Dr., Greenacres, Florida 33415, which is approximately one minute from ISAGUIRRE's residence. The CHS arrived at the new deal location at approximately 7:25 p.m. At approximately 7:26 p.m., DEA TFO James Burket observed and video recorded ISAGUIRRE arrive in the parking lot of his apartment complex driving a gray Chevrolet Silverado bearing Florida Tag 17DNYZ. Per DAVID, the gray Chevrolet Silverado is registered to ISAGUIRRE. ISAGUIRRE exited the vehicle wearing a red shirt and black shorts, and he entered the front gate of his apartment. DEA TFO Burket relayed this information to the other agents and TFOs involved in the operation.

6

17.     At approximately 7:35 p.m., DEA TFO Burket observed and recorded ISAGUIRRE exit his residence, wearing the same red shirt and black shorts, and return to the driver seat of his vehicle. DEA TFO Burket, DEA TFO Kyle Schuck, and DEA SA Brian Lammers maintained a constant visual of ISAGUIRRE's vehicle as it traveled from his residence to the deal location. At approximately 7:37 p.m., ISAGUIRRE pulled into the parking lot where the CHS was waiting and parked next to the CHS.

18.     While equipped with the live stream audio/video recording device, the CHS exited his/her vehicle and got into the front passenger seat of ISAGUIRRE's vehicle. Inside ISAGUIRRE's vehicle, ISAGUIRRE provided the CHS with the pills in exchange for the $900 as agreed. During the interaction inside ISAGUIRRE's vehicle, ISAGUIRRE was observed on the live stream audio/video recording device and positively identified by me, FBI TFO Peppiatt, and DEA TFO Burket. At approximately 7:56 p.m., the CHS exited ISAGUIRRE's vehicle and returned to his/her vehicle. ISAGUIRRE departed the deal location in his vehicle and returned to his residence, as observed by DEA SA Lammers, DEA TFO Schuck, and DEA TFO Burket. Once ISAGUIRRE arrived home, DEA TFO Burket observed ISAGUIRRE exit his vehicle and walk inside the front gate.

19.     Meanwhile, the CHS returned to the predetermined location to meet with agents and TFOs. FBI TFO Peppiatt and I maintained a constant visual on the CHS as he/she returned to the predetermined location. Once at the predetermined location, FBI TFO Peppiatt and I collected the narcotics from the CHS. FBI TFO

Peppiatt, witnessed by me, conducted a search of the CHS and the CHS's vehicle and found no illegal contraband. The CHS was debriefed about what occurred, and he/she provided information that was consistent with what was observed on the live feed audio/video recording device.

20.     FBI TFO Peppiatt field tested the pills the CHS purchased from ISAGUIRRE, which yielded a presumptive positive for the presence of methamphetamine. FBI TFO Peppiatt later transported the narcotics to the Titusville Police Department. On November 13, 2025, FBI TFO Peppiatt and DEA TFO Burket retrieved the narcotics from the Titusville Police Department's Evidence Section and shipped them via FedEx to the DEA Southeast Laboratory for analysis. There, the substance was identified as methamphetamine. The net weight was 145.9 grams with a total of 298 tablets.

### March 23, 2026 – Deal for a Kilogram of Cocaine

21.     On Monday, March 23, 2026, I, FBI SA Nishandra Rosa, FBI SA Mathew Pagliarini, FBI TFO Patrick Kenny, FBI TFO Adam Butler, and DEA SA Lammers utilized the CHS for a controlled purchase of one kilogram of cocaine from ISAGUIRRE for $17,500. This deal was previously arranged between the CHS and ISAGUIRRE. ISAGUIRRE informed the CHS that he was on his way to the previously discussed location in Brevard County, Florida, within the Middle District of Florida.

22.     Before the deal, FBI and DEA personnel met with the CHS at a predetermined location in Palm Bay, Florida. I, witnessed by DEA SA Lammers,

8

searched the CHS and the CHS's vehicle, and no illegal contraband was located. I and DEA SA Lammers equipped the CHS with audio/video recording devices. I provided the CHS with approved government funds for the deal.

23.     At approximately 12:23 p.m., the CHS traveled to the meeting location, which was a shopping center in Brevard County. Around 12:25 p.m., ISAGUIRRE informed the CHS that he was at the deal location. At approximately 12:35 p.m., ISAGUIRRE was observed by DEA SA Lammers exiting a restaurant within the shopping center and walking towards a black Mercedes bearing Florida Tag NDBE79, which was registered to ISAGUIRRE and a female. ISAGUIRRE wore a gray shirt. ISAGUIRRE approached the trunk of the Mercedes and retrieved an item. Upon exiting his vehicle, ISAGUIRRE entered the front passenger seat of the CHS's vehicle carrying a black bag.

24.     Upon entering the CHS's vehicle, ISAGUIRRE removed a rectangular object (the suspected kilogram of cocaine) from the black bag and provided it to the CHS by placing it inside an empty shoe box. The object was red with a clear wrapping. A Hamsa hand was portrayed on one side. The CHS provided ISAGUIRRE with the government-issued funds that were previously provided to the CHS by me.

25.     ISAGUIRRE explained the markings on other kilogram packages he received. ISAGUIRRE referenced the product coming from an individual in Miami. A female exited the restaurant ISAGUIRRE was previously observed leaving, and she was confirmed to be ISAGUIRRE's "girl" and the other registered owner of the

9

Mercedes. ISAGUIRRE exited the CHS's vehicle and returned to the restaurant he previously exited, joining the female at an outside table.

26.    At approximately 12:49 p.m., the CHS returned to the predetermined meeting location. I and DEA SA Lammers maintained a constant visual on the CHS as he/she returned. Once at the predetermined location, I and DEA SA Lammers deactivated and collected the audio/recording devices. I collected the drug evidence from the CHS. DEA SA Lammers, witnessed by me, conducted a search of the CHS's vehicle, and no illegal contraband was found. I, witnessed by DEA SA Lammers, conducted a search of the CHS, and no illegal contraband was found. The CHS was debriefed about what occurred.

27.    I and FBI SA Rosa transported the evidence collected to the Brevard Resident Agency. After processing, the product was resealed and placed inside a safe. On March 24, 2026, DEA SA Lammers shipped the cocaine via FedEx to the DEA Southeast Laboratory for analysis. There, the substance was identified as cocaine hydrochloride. The net weight was 1,003.1 grams.

### Additional Surveillance

28.    On June 9, 2026, the FBI, DEA, and local law enforcement conducted surveillance of ISAGUIRRE at his residence in West Palm Beach, Florida. At approximately 6:12 p.m., ISAGUIRRE exited his residence and was observed wearing shorts, no shirt, and sandals. ISAGUIRRE entered his Chevrolet Silverado and traveled to apartments located on Sherwood Glen Way in West Palm Beach, Florida. The apartment complex is approximately 0.7 miles from ISAGUIRRE's

apartment complex. Once in the complex, ISAGUIRRE parked towards the east of the community, near the pool parking. ISAGUIRRE met with the occupant of a gray Kia sedan bearing Florida Tag PMT5S. A Hispanic male was observed as the sole occupant of the vehicle. DEA TFO Burket identified the occupant and driver of the gray Kia as the registered owner of the vehicle, M.L.K. Afterwards, ISAGUIRRE departed the complex. A review of toll records for ISAGUIRRE's cellphone number revealed that a phone number attributable to M.L.K. called ISAGUIRRE at approximately 5:44 p.m. and 6:06 p.m. The phone contacts and in-person interaction between ISAGUIRRE and M.L.K. were brief. Based on law enforcement training and experience, these quick interactions by phone and in person are consistent with an individual contacting someone and then a hand-to-hand drug deal occurring.

29.    At approximately 6:22 p.m., ISAGUIRRE arrived at another apartment complex on Greengate Cir. in West Palm Beach, Florida. Prior reports from the CHS revealed this location to be associated with drug trafficking activities involving ISAGUIRRE as the CHS had previously witnessed a delivery of kilograms of cocaine to this location for ISAGUIRRE. ISAGUIRRE backed into a parking spot, but agents and TFOs were unable to maintain visual coverage. At approximately 6:32 p.m., ISAGUIRRE was observed departing the apartment complex and traveling west on Purdy Lane. At approximately 6:34 p.m., ISAGUIRRE returned to the parking lot of his residence. ISAGUIRRE remained in his vehicle until approximately 6:51 p.m. before he exited his vehicle and entered his residence.

11

30.    At approximately 7:28 p.m., ISAGUIRRE exited his residence and was observed in the back seat of his Chevrolet Silverado. ISAGUIRRE then entered the driver's seat and drove out of the neighborhood. ISAGUIRRE traveled to a mobile home park on 16th Place S., an approximate five-minute drive from his residence. ISAGUIRRE remained in the mobile home park for approximately 15 minutes before departing.

31.    ISAGUIRRE traveled to a residence on Jackson Ave. in Greenacres, Florida and met with a Hispanic male. This Hispanic male met with ISAGUIRRE at the front driver side of ISAGUIRRE's vehicle. Per law enforcement reporting, N.R. is known to reside at that address. Phone tolls revealed prior communications between ISAGUIRRE and a phone number attributable to N.R. throughout the investigation, including the evening of surveillance. Specifically, at approximately 6:55 p.m. and 6:56 p.m., ISAGUIRRE received two text messages from N.R. At 7:10 p.m., ISAGUIRRE sent a text message to N.R. Based on law enforcement training and experience as well as the circumstances surrounding this investigation, this brief in-person interaction, coupled with the phone contacts surrounding the interaction, is consistent with a hand-to-hand drug transaction.

32.    Following this interaction, ISAGUIRRE returned to his residence. Upon exiting his Chevrolet Silverado, ISAGUIRRE carried a partially unzipped backpack that contained a white plastic bag.

12

**July 21, 2026 – Arranged Deal for One Kilogram of Cocaine and Arrest of ISAGUIRRE**

33.     On Tuesday, July 21, 2026, DEA TFO Burket and I met with the CHS to arrange a controlled purchase of one kilogram of cocaine from ISAGUIRRE for a previously agreed-upon price of $18,000. It was agreed between the CHS and ISAGUIRRE that they would meet at a shopping center in Brevard County, in the Middle District of Florida, for the deal, as they had previously done. At approximately 10:19 a.m., ISAGUIRRE texted the CHS and informed him/her that he was waiting on his mother-in-law to watch his daughter. At approximately 12:52 p.m., ISAGUIRRE informed the CHS that he was on his way. At the same time, FBI TFO Heather Timm witnessed ISAGUIRRE and a female enter ISAGUIRRE's black Mercedes and leave ISAGUIRRE's residence in West Palm Beach. ISAGUIRRE was the driver of the vehicle and was observed carrying a backpack as he entered the vehicle. FBI agents maintained surveillance on ISAGUIRRE, and at approximately 1:13 p.m., ISAGUIRRE traveled northbound on the Turnpike at Southern Blvd., a route to exit West Palm Beach and travel north.

34.     At approximately 2:12 p.m., ISAGUIRRE informed the CHS that he was 30 minutes away from their meeting location in Brevard County. Law enforcement personnel were in the area and waiting for ISAGUIRRE to enter the shopping center. At approximately 2:38 p.m., ISAGUIRRE informed the CHS that he was at the deal location by stating, "here." Members of the Palm Bay Police Department (PBPD) witnessed ISAGUIRRE's black Mercedes enter the shopping

13

center and park in the center of the parking lot. As the vehicle parked, PBPD made contact with B.D., the driver of the vehicle, and ISAGUIRRE, who was seated in the front passenger seat at that time. ISAGUIRRE was detained.

35.    A black backpack was observed in the backseat. Inside the backpack was a brick-shaped object, wrapped in a black and clear vacuum-sealed bag. A rectangular object (the suspected kilogram of cocaine) was inside, which was contained in an aluminum wrapper. The item was collected. No other items were located in the backpack. Later, the suspected kilogram of cocaine was field tested, which indicated positive for cocaine. The total weight of the package was 1,212.5 grams.

36.    An interview with B.D. was conducted, and she advised that she traveled with ISAGUIRRE, her boyfriend, to meet his friend. B.D. stated she had no knowledge of ISAGUIRRE participating in any drug trafficking activities. B.D. also stated that ISAGUIRRE did not work and had no source of income.

37.    ISAGUIRRE was transported to the PBPD for an interview with me and DEA TFO Burket. ISAGUIRRE was read his *Miranda* rights and agreed to speak without an attorney present. ISAGUIRRE was questioned about the kilogram of cocaine that was located in his vehicle. Although he did not make any direct statements about the kilogram of cocaine, ISAGUIRRE did state that he did not owe money to anyone for the kilogram and that his family was not in danger. Among other things, ISAGUIRRE also alluded to knowing large-scale drug suppliers.

## CONCLUSION

38.    Based on the foregoing, I submit that probable cause exists that on March 23, 2026, ISAGUIRRE knowingly distributed a controlled substance, specifically 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

_____

Special Agent Rebecca Spears
Federal Bureau of Investigation

Affidavit submitted by electronic means and attested to me as true and accurate by telephone and/or video conference consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) before me this __22nd__ day of July, 2026.

_____

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

15